**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **LISA MENEFEE-BELL,** ) | **CASE NO. 1:08CV2725** |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MAGISTRATE JUDGE GREG WHITE** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
|   **COMMISSIONER, SOCIAL** ) | |
|   **SECURITY ADMINISTRATION,** ) | |
| ) | |
| Defendant. ) | **MEMORANDUM OPINION &** |
| ) | **ORDER** |

Plaintiff Lisa Menefee-Bell ("Menefee-Bell") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying her claims for Period of Disability ("POD"), Widow's Insurance Benefits ("WIB") under Title II and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423(d), 1382c. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the Court vacates the final decision of the Commissioner and remands for further proceedings consistent with this opinion.

**I. Procedural History**

In October 2004, Menefee-Bell filed an application for SSI benefits as well as for

Widow's Insurance Benefits ("WIB"). (Tr. 49-53.)[1] With respect to plaintiff's WIB claim, such applications are to be evaluated under the same standards as applied to Title II disability claims. Omnibus Budget Reconciliation Act (OBRA) of 1990, Pub.L. No. 101-508, § 5103. In Menefee-Bell's applications, she alleged a disability onset date of March 1, 2004, and claimed she was disabled due to bilateral knee/hip pain, arthritis in her right arm, carpal tunnel syndrome and diabetes. (Tr. 535-37, 540-42.)[2] Her applications were denied both initially and upon reconsideration. Menefee-Bell timely requested an administrative hearing.

On January 24, 2008, Administrative Law Judge Norman R. Buls ("ALJ") held a videoconference hearing at which Menefee-Bell, represented by counsel, testified.[3] On May 29, 2008, the ALJ found Menefee-Bell had the residual functional capacity ("RFC") to perform her past relevant work as a retail salesperson and, therefore, concluded she was not disabled within the meaning of the Act. The ALJ's decision became the final decision of the Commissioner after the Appeals Council denied further review.

On appeal, Menefee-Bell argues there was not substantial evidence: 1) to support the ALJ's assessment of her treating source's opinion; 2) to support the ALJ's credibility assessment; or 3) to find that she could return to past relevant work.

## II. Evidence

**Personal and Vocational Information**

Menefee-Bell was born on December 1, 1949, making her 55 years old on the date of the ALJ's decision. (Tr. 49.) She is a high school graduate and has past relevant work as a retail

---

[1]The ALJ inadvertently referred to Plaintiff's application for Widow's Benefits as disability benefits under 42 U.S.C. § 401 (Title II). (Tr. 15.) As the Commissioner points out in his brief on the merits, the ALJ's misstatement has no effect on his evaluation of Plaintiff's claim. (Tr. 15.) The SSI application falls under Title XVI while WIB falls under Title II.

[2]The application for SSI is not contained in the transcript. The application for Widow's Benefits was provided. (Tr. 49-51.)

[3]The ALJ was in Tucson, Arizona while Menefee-Bell and her counsel were in Cleveland, Ohio.

salesperson. (Tr. 21, 531.) Her husband, Albert J. Menefee, died on August 28, 2004.

**Medical Evidence**

The Court will focus on the record pertaining to Menefee-Bell's back, hip and knee conditions as she has not raised arguments regarding her other impairments (e.g., hypertension, diabetes mellitus type II, and asthma.) *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146 (6th Cir. 1990) (issue waived in appellate court when not raised to district court.)

Medical records from 1993 refer to Menefee-Bell being diagnosed at age nine with Osgood-Schlatter, a disease causing pain in her knees. (Tr. 134.)

In November 2005, MetroHealth Clinic physician El-Khoury, M.D., ordered hip and pelvis x-rays after Menefee-Bell complained of hip pain. (Tr. 233-36.) X-rays revealed a hook-like bony growth overlying the hip joint which was probably an osteophyte formation. (Tr. 230.) Dr. El-Khoury prescribed Ultram and Arthrotec. (Tr. 234.)

In December 2005, James Walker, M.D., of the Cleveland Clinic, evaluated Menefee-Bell's complaints of significant hip, knee, shoulder, wrists, and finger joint pain, which began approximately eleven months earlier. (Tr. 426-27.) On examination, Menefee-Bell had full range of motion in her bilateral hips/knees and 100% weight bearing status. (Tr. 427.) X-rays of the left hip and bilateral knees were generally normal except that the right pelvis had two calcified pheboliths. (Tr. 410-12.) He concluded that the x-rays looked good, except for "a little bit of osteopenia." (Tr. 426.) He prescribed Relafen to reduce general inflammation and gave her a Hyalgan shot in her left knee, as it bothered her the most. *Id.* Dr. Walker also planned to set up an appointment for Menefee-Bell at the Rheumatology Department to determine if there may be a rheumatologic condition. *Id.*

In February 2006, an MRI was taken of Menefee-Bell's left knee which showed severe degenerative chondral changes of the patella. (Tr. 405.) The cartilage in the knee was thinning and irregular. *Id*. A bone density scan was also conducted of her spine and pelvis confirming osteoporosis. *Id*.

Also in February 2006, Menefee-Bell met with Physical Therapist Kelly Campagna. Menefee-Bell reported that she had periods of knee pain throughout her life, with recent bouts of

pain within the preceding year. (Tr. 402-403.) She said she had knots on her kneecaps, and she claimed difficulty kneeling, bending, and walking stairs. She reported that, in the past year, she had fallen while going down the stairs. *Id*. She also said that during the last year, she began using a cane. *Id.* Following examination, the therapist recommended four weeks of physical therapy and four weeks of water therapy. *Id.*

In March 2006, Menefee-Bell again visited Dr. Walker for on-going chronic joint pain in her legs, arms, wrists, hands, shoulder, neck, and back. (Tr. 394.) Shoulder and wrist x-rays showed mild degenerative changes at the acromioclavic joint of the right shoulder along with acrominal spur formation. (Tr. 388.) Wrist x-rays showed possible coalition between the capitate and hamate bones in both wrists, documenting carpal tunnel syndrome. (Tr. 391.) As to her knee, he noted that the left knee MRI showed significant degenerative changes in the joint. (Tr. 394.) Dr. Walker wrote: "Her x-rays actually look pretty good from her wrists, her hands, her shoulders and elbow. I am not sure exactly what is causing all of her pain. The way she walks and behaves, it is almost like she is a little parkinsonian. If we cannot find anything else, we are going to have to have primary care check this out." (Tr. 394.) Dr. Walker further noted that rheumatology had not found anything "in particular." (Tr. 395.)

In August 2006, Dr. Walker administered a Hyalgan shot in Menefee-Bell's right knee. (Tr. 386.) A bilateral knee MRI showed moderate diffuse osteopenia. (Tr. 387.) She received a total of ten Hyalgan shots in both of her knees. (Tr. 357, 361, 363, 365, 369, 386.)

In October 2006, Menefee-Bell was seen by Dr. Peter Evans at the Cleveland Clinic for arm and shoulder pain. (Tr. 380.) She was also experiencing tingling, numbness, and burning in her hand. *Id*. Dr. Evans found that testing of her left shoulder was negative but assessed right rotator cuff bursitis, right medial epicondylitis, and bilateral carpal tunnel syndrome, worse in the left hand. (Tr. 381.) He recommended that she see a psychologist for her depression and other possible mood problems as she seemed to have "a fair bit of difficulty in dealing" with her symptoms.[4] *Id*.

---

[4]The record does not indicate that she followed up with a psychologist.

Menefee-Bell saw Dr. Walker again on October 19, 2006. She reported that the Hyalgan shots she had last received in August helped relieve the pain in her knees. (Tr. 373.) Dr. Walker determined that the Hyalgan treatment should be started again. *Id.* At this exam, Dr. Walker noted full range of motion with 100% weight bearing in both knees. (Tr. 374.)

Also in October 2006, Menefee-Bell participated in physical therapy at the Cleveland Clinic for chronic arm pain, which limited her ability to dress, groom herself and to lift objects. (Tr. 376.) The therapist noted that at the end of the hour-long session, Menefee-Bell experienced intense pain.[5] (Tr. 378.)

In February and March 2007, Menefee-Bell underwent carpal tunnel surgery on both wrists. (Tr. 331, 335.) At a follow-up appointment with Dr. Evans, she reported that she had a constant sharp pain and sensations of pulling, pinching and burning in her left hand. (Tr. 333.)

From May 2006 through April 2007, Menefee-Bell also treated with Patrick Gallagher, M.D., of Lee-Harvard Treatment, Inc., as her general medical doctor. (Tr. 430-485.) In April 2007, Dr. Gallagher completed a physical residual functional capacity assessment form. (Tr. 484-485.) The RFC showed that Menefee-Bell was limited in her ability to lift and carry objects and was markedly limited in her ability to stand, walk, sit, pull, push, bend, reach, and handle items. *Id.* He noted that Menefee-Bell could stand/walk for two hours in an eight-hour day and for one hour without interruption, and that she could sit for four hours, two hours without interruption. *Id.* at 485. He also limited Menefee-Bell to lifting six to ten pounds frequently, and eleven to twenty pounds occasionally. *Id.* He concluded that Menefee-Bell was unemployable and disabled due to generalized arthritis, osteopenia, bilateral carpal tunnel syndrome and spondylitis. *Id.*

In February 2008, Kimberly Toghatti-Trickett, M.D., of Independence Rehab, Inc., performed a physical examination at the request of the State Agency. (Tr. 493-500.) On examination, Menefee-Bell had no problems handling objects with either hand. (Tr. 493-495.)

---

[5]The Court notes that Menefee-Bell told the therapist that she had injured her hand in an elevator incident causing her pain throughout her arm. (Tr. 376-77.)

5

The doctor opined that Menefee-Bell's subjective complaints significantly outweighed her mostly normal objective findings and treatment history. *Id*. In a letter to the State Agency dated February 26, 2008, the doctor opined that Menefee-Bell could sit, stand, and walk for at least two to three hours at a time, and could lift and carry up to twenty pounds without difficulty. (Tr. 493-494.) Also, the RFC form noted that Menefee-Bell was limited to standing/walking for no more than four hours in an eight-hour work day. (Tr. 500.)

### Hearing Testimony

At the hearing on January 24, 2008, Menefee-Bell testified that she resides in a two-story house with her grandchildren (at the time of the hearing, ages 13 and 14) of whom she has permanent custody. (Tr. 532, 539.)

She said she last worked at Value City Department store in a part-time retail position in 2005. (Tr. 535.) She stopped working because of pain in her legs and hips, arthritis in her right hand, high blood pressure, and blood sugar problems. (Tr. 535-536.) She indicated that in the last two years, she is using a cane due to her leg and hip pain. (Tr. 537, 541.)

Menefee-Bell testified that her daily activities include walking down the stairs to the kitchen where she eats something simple for breakfast like toast, or microwaveable oatmeal because she cannot handle pots and pans. (Tr. 537-38, 543.) The children wake on their own and dress and feed themselves. (Tr. 538.) After breakfast, she goes back up the stairs to her bedroom where she sits and watches television or reads the Bible. (Tr. 539.) When asked about laundry chores, she said that she is not able to do her own laundry. Family members help her, and the grandchildren do their own laundry. *Id*. She also testified that most of the grocery shopping is done by the grandchildren. *Id.* She may drive them to the store, but then she sits in the car while they shop. *Id.* When she goes into the store, she walks around for five or ten minutes and then returns to the car. *Id*. In good weather, she sometimes walks to the corner or sits in the backyard. (Tr. 540.) She also testified that her daughter is helping her look for a single-story home to live in. (Tr. 542-43.)

When asked whether her carpal tunnel surgery was successful, she responded it helped "a little bit," but she still has swelling and she cannot pick up or open objects. (Tr. 543.) She said

that she is unable to hold a cup of coffee without it slipping out of her hands. *Id*. When asked what was the most she could lift and carry, she replied, "maybe a loaf of bread." *Id*.

At the conclusion of the hearing, the ALJ stated that he was going to send Menefee-Bell for an orthopedic consultative examination and RFC. (Tr. 544-45.) Her attorney responded that Menefee-Bell had recently been treated at Akron General's Orthopedic Clinic and once those records were received, they would be submitted to the ALJ.[6] (Tr. 545.)

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[7]

A claimant is entitled to POD only if: (1) she had a disability; (2) she was insured when

---

[6] Neither an orthopedic consultative exam/RFC nor records from Akron General Orthopedic Clinic appear in the record.

[7] The ALJ applies a five-step process to determine whether a claimant is disabled within the meaning of the Social Security Act. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. 20 C.F.R. § 416.905. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id*. A "severe impairment" is one which significantly limits . . . physical or mental ability to do basic work activities." *Id.* Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. *Id*. Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does present her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The claimant bears the burden through the first four steps and the Commissioner bears the burden of proof at the final step. *Longworth v. Comm'r. Soc. Sec. Adm.*, 402 F.3d 591, 595 (6th Cir. 2003). The Commissioner must "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity," 20 C.F.R. § 404 § 965, and taking into account vocational factors such as age, education, and skills. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Menefee-Bell was insured on her alleged disability onset date, March 1, 2004, and remained insured through the date of the ALJ's decision. (Tr. 15.) Therefore, in order to be entitled to POD and WIB, Menefee-Bell must establish a continuous twelve-month period of disability commencing between March 1, 2004, and May 29, 2008. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

After consideration of the entire record, the ALJ made the following findings regarding Menefee-Bell:

1. She meets the insured status requirements.
2. She has not engaged in substantial gainful activity since March 1, 2004, the alleged onset date.
3. She has the following severe impairments: history of osteoporosis and osteoarthritis, hypertension, diabetes mellitus type II, and post bilateral carpal tunnel syndrome release.
4. She does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.
5. She has the residual functional capacity to perform a limited range of light work, or work which requires maximum lifting of twenty pounds and frequent lifting of ten pounds. She can sit, stand and walk for two to three hours at a time.
6. She is capable of performing past relevant work as a retail salesperson.

      7.      She was not disabled within the meaning of the Act at any time between the alleged onset date, March 1, 2004, and the date of the ALJ's decision.

(Tr.17-21.)

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Commissioner of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must consider whether the proper legal standard was applied. Failure of the commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the commissioner applied the correct legal standards are grounds for reversal where such failure

prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

### A. Substantial Evidence as to Past Relevant Work

Menefee-Bell contends that the ALJ gave great weight to only a portion of Dr. Toghatti-Trickett's RFC calculation, as the ALJ failed to note that the doctor limited Menefee-Bell to standing/walking no more than four hours in an eight hour day. Menefee-Bell argues that if the ALJ had considered the full RFC assessment, she could not be classified at the light level.[8] Therefore, she would be unable to perform her past relevant work as a sales clerk. (Doc. No. 16, Pl. Br. at 16.)

The Commissioner avers that the ALJ's conclusion is proper as the ALJ considered Dr. Toghatti-Trickett's entire opinion to conclude that Menefee-Bell was capable of performing past

---

[8] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b); 20 C.F.R. § 416.967(b).

SSR 83-10 defines "frequent" as follows:

. . . occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time.

relevant work. The Commissioner then relies on the Dictionary of Occupational Titles ("DOT") to show that Menefee-Bell's past relevant work as a sales clerk is classified as light exertional-level work. (Def. Br. at 11.) *See* DOT # 290.477-014, Sales Clerk (Retail Trade).

The ALJ must first identify the claimant's functional limitations or restrictions by assessing the work-related exertional and non-exertional functions[9] to determine whether the individual is able to do past relevant work and/or to calculate an RFC. *See* SSR 96-8P, at 2, 5; *Delgado v. Comm. of Soc. Sec.*, 30 Fed.Appx. 542, 547-548, 2002 WL 343402 (6th Cir. 2002) (unpublished). Ordinarily, RFC is the claimant's maximum remaining ability to do sustained work activities in a work setting on a regular and continuing basis. *Id*. at 2. A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule." *Id*. The ALJ must include in the RFC assessment a discussion of the claimant's abilities on that basis. *Id*.

Further, the ALJ must consider each function separately ("e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull"). *Id*. at 5. Although the regulations describing the exertional levels of work and the DOT pair some functions, it is not invariably the case that treating the activities together will result in the same decisional outcome as treating them separately. *Id*. It is especially important that adjudicators consider the capacities separately when deciding whether an individual can do past relevant work. *Id*. Only after this analysis may a claimant's RFC be expressed in terms of the exertional levels of work, i.e., sedentary, light, medium, heavy, and very heavy. *Id*.

The ALJ's decision applied Dr. Toghatti-Trickett's RFC as follows:

> In February 2008, medical consultant Kimberly Toghatti-Trickett, M.D., conducted an evaluation of the claimant and gave a diagnostic impression of a history of osteoporosis and osteoarthritis along with hypertension and diabetes mellitus. Dr. Toghatti-Trickett believed that the claimant's subjective complaints significantly outweighed her objective findings based on her history and the

---

[9]The exertional functions are lifting, carrying, standing, walking, sitting, pushing, and pulling. The nonexertional functions are manipulative, postural, visual, communicative, and mental.

> examination findings. Dr. Toghatti-Trickett opined that the claimant could sit, stand and walk for at least two to three hours at a time, and could lift and carry up to 20 pounds without difficulty. Claimant had no problems hearing, seeing, speaking, traveling, or handling objects with either hand (Exhibit 3F). The undersigned gives controlling weight to the opinion of Dr. Toghatti-Trickett, as defined in the regulations. Her opinion is well supported by objective findings and is not inconsistent with the other substantial evidence (20 CFR 404.1527(d)(2) and 416.927(d) (Social Security Ruling 96-2p).

(Tr. 20.) The ALJ found that Dr. Toghatti-Trickett's RFC was consistent with the objective medical evidence in the record and concluded that Menefee-Bell could sit, stand and walk for two to three hours at a time. He ignored, however, the portion of Dr. Toghatti-Trickett's findings that limited Menefee-Bell to standing/walking for no more than three or four hours in an eight-hour day.[10] (Tr. 500.)

The ALJ also gave less weight to the opinion of Dr. Gallagher, one of Menefee-Bell's treating physicians, by concluding that Dr. Gallagher's opinion was without substantial support from objective findings in the record, and that the doctor relied heavily on Menefee-Bell's subjective report of symptoms and limitations. (Tr. 19.) Dr. Gallagher's RFC assessment showed that Menefee-Bell could stand/walk for two hours in an eight-hour day and for one hour without interruption. (Tr. 485.)

The Commissioner argues that as the ALJ adopted Dr. Toghatti-Trickett's RFC assessment in its entirety, he considered all of her clinical findings. Yet, clearly the ALJ does not mention the four-hour exertional limitation as to standing/walking, nor does he explain how Menefee-Bell could perform her past relevant work. The Commissioner next relies on the DOT's definition of a retail sales clerk to demonstrate that it is considered light exertional level

---

[10]The Court also notes Dr. Toghatti-Trickett's finding as to Menefee-Bell's ability to carry twenty pounds **continuously**. (Tr. 499). When that finding is considered in conjunction with SSR 83-10 (see footnote 8), in order to be able to carry continuously, a subject must also be continuously on his feet, standing or walking. Yet, Dr. Toghatti-Trickett also found that Menefee-Bell is limited to standing/walking for no more than three or four hours in an eight-hour day.

12

work.[11] (Doc. No. 19 at 11.) Although the definition gives a detailed list of typical job duties, it does not reference the exertional limits required for the position.

The ALJ concluded that Menefee-Bell was able to perform light work as she can sit, stand and walk for two to three hours at a time. (Tr. 18.) In fact, he stated, "She has no other limitation." *Id*. The ALJ, in so stating, failed to take into account additional limitations as to the maximum number of hours in an eight-hour shift that Menefee-Bell could stand or walk found by Dr. Toghatti-Trickett. In finding that she could perform her past relevant work, it is not clear that the ALJ considered her functions of walking or standing. Moreover, at the hearing, the ALJ did not question her regarding the exertional functions of her past work, even after she testified that she quit the job due to problems with her legs. (Tr. 535.) Even though the ALJ found that the record contained very little objective medical evidence to substantiate Menefee-Bell's pain, the ALJ should have specifically addressed Menefee-Bell's exertional limitations prior to concluding she could perform her past work. *See* 20 C.F.R. § 404.1520(f); § 404.1650(b); *see also Smith v. Sec'y of Health and Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989); *Najera v. Sullivan*, 902 F.2d 12, 13 (8th Cir. 1990). The scope of judicial review is limited to an examination of the record only. 42 U.S.C. § 405(g). This Court cannot determine whether

---

[11]The DOT's definition for sales clerk (retail trade) is as follows:

> Obtains or receives merchandise, totals bill, accepts payment, and makes change for customers in retail store such as tobacco shop, drug store, candy store, or liquor store: Stocks shelves, counters, or tables with merchandise. Sets up advertising displays or arranges merchandise on counters or tables to promote sales. Stamps, marks, or tags price on merchandise. Obtains merchandise requested by customer or receives merchandise selected by customer. Answers customer's questions concerning location, price, and use of merchandise. Totals price and tax on merchandise purchased by customer, using paper and pencil, cash register, or calculator, to determine bill. Accepts payment and makes change. Wraps or bags merchandise for customers. Cleans shelves, counters, or tables. Removes and records amount of cash in register at end of shift. May calculate sales discount to determine price. May keep record of sales, prepare inventory of stock, or order merchandise. May be designated according to product sold or type of store.

Menefee-Bell is capable of performing her past relevant work or whether the RFC determination was correct.  As such the Court cannot conclude that the ALJ's findings were supported by substantial evidence.

### B.  Treating Source Medical Opinion

Menefee-Bell also argues that the ALJ did not state valid reasons for assigning the medical opinion of Dr. Gallagher, her treating source, less weight.  The Commissioner again contends that there is substantial evidence to support the ALJ's assessment of the medical source opinion.

The treating physician rule requires an ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Blakley v. Comm'r of Soc. Sec.*, – F.3d –, 2009 WL 3029653 (6th Cir. Sept. 24, 2009) (*quoting Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  An ALJ must give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); § 404.927(d)(2).  If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion.  *Id*.

The regulations also give ALJs a clear procedural requirement when issuing a decision.  "We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion."  *Id.*  SSR 96-2p explains that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical

14

opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight." 1996 WL 374188, at *5 (1996). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that her physician has deemed her disabled and, therefore, "might be especially bewildered when told by an administrative bureaucracy that [she] is not, unless some reason for the agency's decision is supplied." *Wilson* at 544 (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)). The requirement also permits meaningful review of the ALJ's application of the rule. *Wilson* at 544.

Menefee-Bell contends that the ALJ "cherry picked" the statements from the medical record supporting his opinion of non-disability. (Doc. 16, Pl. Br. at 13.) For example, the ALJ stated in his decision that "rheumatology apparently did not find anything in particular" (Tr. 19) and cites to the record at pages 265 and 266. Menefee-Bell argues that the record at those pages documents much more. The doctor did make that statement, but he continued on to say, "so I want to work on her knee, check out the shoulder, and at some point, I might want to at least get her into water therapy." (Tr. 395.)

The record reflects that Menefee-Bell was treated by Dr. Gallagher from May 2006 through April 2007. Dr. Gallagher's RFC assessment identified greater restrictions on Menefee-Bell's ability to work than those ultimately found by the ALJ. The ALJ gave less weight to Dr. Gallagher's opinion claiming that it was without substantial objective support and that it relied heavily on the claimant's subjective report of symptoms. The ALJ then reviewed the medical record of other treating doctors and concluded that there was little evidence of a disability. Lastly, the ALJ concluded that Dr. Toghatti-Trickett's opinion was well-supported by objective findings and gave it controlling weight.

The ALJ's decision to accord greater weight to state agency physicians over Menefee-Bell's treating doctor was not, by itself, reversible error. *See Blakley* at *9. "In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources." *Blakley* (*quoting* SSR 96-6p, 1996

15

WL 374180, at *3 (July 2, 1996)). However, in giving less weight to Dr. Gallagher's opinion, the ALJ did not evaluate the other factors listed in § 1527(d)/§ 927(d) as to the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, or specialization.[12] Although Dr. Gallagher's conclusion that Menefee-Bell was disabled in his RFC assessment is not binding on the Commissioner, a clearer reason should have been given by the ALJ for rejecting the assessment of Menefee-Bell's exertional limitations. The ALJ did state that the findings were not supported by the record. He then should have addressed the factors under § 1527(d)/ § 927(d) in determining what weight to give Dr. Gallagher's opinion. He did not specifically do so. It is not sufficient for the ALJ to justify his decision by suggesting that Dr. Gallagher appeared to rely heavily on Menefee-Bell's subjective complaints. A similar justification in *Blakley* was rejected by the Sixth Circuit.[13]

The *Blakley* and *Wilson* Courts instruct that when the ALJ fails to give good reasons on the record for according less than controlling weight to treating sources, the decision should be reversed and remanded unless the error is a harmless *de minimis* procedural violation. *See Blakley* at *9; *Wilson*, 378 F.3d at 547. Such harmless error may include the instance where "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it,' or where the Commissioner "has met the goal of . . . the procedural safeguard of reasons." *Wilson*, 378 F.3d at 547. However, the ALJ's failure to follow the procedural rule does not qualify as harmless error when a court cannot engage in a "meaningful review" of the ALJ's

---

[12]Moreover, the ALJ at the conclusion of the hearing ordered a consultative examination and an RFC to be performed by an orthopedic specialist, but the ALJ does not mention it in his decision. It may be that Menefee-Bell did not appear for the appointment, or the medical evidence did not establish anything new. The ALJ should have addressed the outcome in his decision.

[13]In *Blakley*, the ALJ summarily rejected a treating doctor's assessment of the claimant's exertional limitations as the ALJ believed the doctor was satisfying his patient's request in order to avoid unnecessary doctor/patient tension. *Blakley* at *8. The ALJ continued, "While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case." *Id*. The Sixth Circuit concluded that "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§§ 1527 and 927.]" *Id.*

decision. *Blakley* at *9.

A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is substantial evidence in the record to support a finding of not disabled. "[A] procedural error is not made harmless simply because [the aggrieved party] appears to have had little chance of success on the merits anyway." *Wilson* at 546; *Mazaleski v. Treusdell*, 562 F.2d 701, 719 n.41 (D.C. Cir. 1977). "To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory." *Wilson* at 547.

### C. Conclusion

For these reasons, the Court finds that the ALJ's decision does not comply with the relevant legal standards. Menefee-Bell can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Sec'y of Health & Human Services*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits only if all essential factual issues have been resolved and proof of disability is compelling). When the ALJ misapplies the regulations or when there is not substantial evidence to support one of the ALJ's factual findings and his decision therefore must be reversed, the appropriate remedy is not to award benefits. The case can be remanded for further consideration.

The Court remands this matter for further factual findings and analysis in accordance with the cited regulations. Having found remand is necessary, the Court need not consider Menefee-Bell's argument regarding the credibility assessment.

### VII. Decision

For the foregoing reasons, the decision of the Commissioner is vacated and the case remanded for further proceedings consistent with this Order.

IT IS SO ORDERED.

                                                 s/ Greg White
                                                United States Magistrate Judge

Date: October 6, 2009